IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KABLOOM FRANCHISING : File No.
CORP.,
: 
and
: **04-10955 NG**
KABLOOM, LTD.
:
        Plaintiffs,     :

v.                      :

DAA-FLORAL, LLC,        :

and                     :

ALAN ARMSTRONG          :

        Defendants.     :

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
### FOR PRELIMINARY INJUNCTION

#### INTRODUCTION

Defendant DAA-Floral, LLC ("DAA") is the former franchisee of Plaintiff KaBloom Franchising Corp. ("KaBloom"). As an inducement to KaBloom entering into a franchise agreement with DAA (the "Franchise Agreement"), defendant Alan Armstrong ("Armstrong") signed a guarantee pursuant to which he agreed, among other things, to individually ensure compliance with the post-termination obligations contained in the Franchise Agreement. Following the termination of the Franchise Agreement, and despite objections by KaBloom, Defendants continue to infringe upon KaBloom, Ltd.'s registered trademarks and have failed to return manuals and other confidential information to Plaintiffs. Defendants' actions will

1

continue to cause irreparable harm to Plaintiffs unless stopped. Plaintiffs seek a preliminary injunction enjoining the misconduct.

## I. STATEMENT OF FACTS

### A.   The KaBloom® System.

KaBloom is a wholly-owned subsidiary of KaBloom, Ltd. *See* Affidavit of Steve Siegel, at ¶ 3 [hereinafter "S. Siegel Affidavit"]. KaBloom and KaBloom, Ltd. (collectively, "Plaintiffs") have developed and own a format and system (the "KaBloom System") for the establishment and operation of retail floral businesses, which operate under the trademarks, trade names, service marks, logos, emblems, and indicia of origin owned by KaBloom, Ltd. and licensed by KaBloom (collectively, the "KaBloom Marks"). *Id.*, ¶¶ 5-7. Per the KaBloom System, KaBloom stores primarily engage in the sale of high quality fresh cut flowers, plants, other complementary and compatible merchandise and gift items, and related floral arrangement services. *Id.*, ¶ 7.

The KaBloom System also includes the KaBloom Marks, which Plaintiffs have created and protected to identify and distinguish KaBloom stores from competitors in the floral business. The KaBloom Marks include the following:

   a.   The name "KABLOOM", which was registered on the Principal Register of the United States Patent and Trademark Office on October 12, 1999 as Federal Registration No. 2286681. *Id.*, ¶ 5(a).

   b.   "KABLOOM", with design, which was registered on the Principal Register of the United States Patent and Trademark Office on October 19, 1999 as Federal Registration No. 2288276. *Id.*, ¶ 5(b).

c. The phrase "KABLOOM THE POWER OF FRESH FLOWERS" with design, which was registered on the Principal Register of the United States Patent and Trademark Office on April 4, 2000 as Federal Registration No. 2337999. *Id.*, ¶ 5(c).

**B.    The Franchise Agreement and Guarantee.**

On July 2, 2003, KaBloom entered a franchise agreement with DAA, which granted DAA a license to operate a KaBloom Store in Ardmore, Pennsylvania for ten years (the "Franchise Agreement"). *Id.*, Exhibit 1. DAA's principal, Alan Armstrong ("Armstrong"), executed a guarantee (the "Guarantee"), which was an exhibit to the Franchise Agreement, and through which Armstrong guaranteed DAA's payments and performance of a variety of obligations under the Franchise Agreement, including the post-termination obligations contained in Section 18. *Id.*, Exhibit C to Franchise Agreement.

Per the Franchise Agreement, KaBloom allowed DAA to participate in the KaBloom System and use the KaBloom Marks solely for the operation of a KaBloom store during the term of the Franchise Agreement. *See* Franchise Agreement, § 1.1 (Exhibit 1 to S. Siegel Affidavit). DAA was authorized to use the KaBloom Marks only in the manner authorized and permitted by Plaintiffs. *Id.*, § 10.2.1. According to the express terms of the Franchise Agreement, any use by DAA of the KaBloom Marks that is not authorized by the Franchise Agreement constitutes infringement. *Id.*, § 10.2.2.

DAA was required to pay certain fees under the Franchise Agreement. DAA agreed to pay a monthly continuing royalty fee based upon DAA's volume of sales. *Id.*, § 4.3. DAA was required to contribute to an advertising fund. *Id.*, § 14.2.2. At the time DAA entered the Franchise Agreement, the required contribution rate was 3%. *Id.* DAA purchased from KaBloom, Ltd. certain products for sale at its KaBloom store (the "Store"). S. Siegel Affidavit, ¶

3

20. DAA was obligated to pay promptly all distributors, lessors, contractors, suppliers, trade creditors, employees, and other creditors promptly as the debts became due. *See* Franchise Agreement, § 9.18 (Exhibit 1 to S. Siegel Affidavit). Failure to make prompt payment constituted a breach of the Franchise Agreement, and KaBloom had the right to terminate the Franchise Agreement in the event DAA failed to promptly make such payments and did not cure such default within five days of receiving written notice of default. *Id.*, § 17.3. KaBloom also had the right to terminate the Franchise Agreement immediately upon certain defaults, including DAA's failure to operate the Store for three consecutive days. *Id.*, § 17.2.2.

Upon termination of the Franchise Agreement, DAA is required to do or refrain from doing certain things, including, but not limited to, the following: (a) refrain from holding itself out as a present or former KaBloom franchisee; (b) immediately cease to use the KaBloom Marks and the System; (c) deidentify the Store from its former affiliation with the KaBloom Marks and the KaBloom System; (d) cancel any assumed name registration which includes the mark "KABLOOM" or any other KaBloom Mark and furnish evidence of compliance to KaBloom within 15 days after termination of the Franchise Agreement; (e) cancel (or transfer, if applicable) any local telephone directory or online directory listings associated with the former KaBloom Store, and provide evidence thereof within 15 days after termination of the Franchise Agreement; (f) change the Store's telephone number, if KaBloom does not assume the lease; and (g) immediately deliver to KaBloom all manuals, supplements, records, and instructions containing confidential information, and all software provided or licensed by KaBloom. *Id.*, § 18.

4

### C. Defendants' Default, Termination, and Violation of Post-Termination Covenants.

DAA failed to pay KaBloom, Ltd. for various products that were ordered by DAA. *See* S. Siegel Affidavit, ¶ 21. DAA also failed to pay KaBloom royalty fees, to make certain advertising contributions, and to make other payments as required by the Franchise Agreement. *Id.*, ¶ 22. By letter dated March 8, 2004, KaBloom gave notice to DAA that it owed past due amounts to KaBloom and KaBloom's affiliates totaling in excess of $35,000 and was in default under the Franchise Agreement. *Id.*, Exhibit 2. The March 8, 2004 letter demanded payment of the past due amounts within five days of receipt of the letter and notified DAA that KaBloom would terminate the Franchise Agreement if DAA failed to cure the default. *Id.* DAA failed to cure the monetary defaults, and on or about March 16, 2004, DAA, through Armstrong, informed a representative of KaBloom that DAA would not be making any payments whatsoever to KaBloom. DAA ceased operating the Store as required by the Franchise Agreement from at least March 23 through 25. S. Siegel Affidavit, ¶ 24.

By letter dated March 26, 2004, sent by counsel for KaBloom at KaBloom's request, KaBloom terminated the Franchise Agreement effective upon receipt, based independently upon each of the foregoing material breaches and DAA's anticipatory repudiation of the Franchise Agreement, and advised DAA that it was to adhere to its post-termination obligations including, among other things, the requirements set forth in Sections 18 and 19.3 of the Franchise Agreement. *See* Affidavit of S. McIntosh, ¶ 4; Exhibit 1 [hereinafter S. McIntosh Affidavit]. By letter dated April 1, 2004, at KaBloom's request, counsel for KaBloom reiterated that DAA was required to comply with its post-termination obligations under the Franchise Agreement, which obligations require that DAA cease using the KaBloom Marks. *Id.*, Exhibit 2. By letter dated April 8, 2004, at KaBloom's request, counsel for KaBloom reiterated to Armstrong that,

pursuant to the Guarantee, he was individually bound by various obligations under the Franchise Agreement, including the post-termination obligations contained therein. *Id.*, Exhibit 3. By letter dated April 22, 2004, counsel for KaBloom sent to counsel for Defendants a letter entitled "DEMAND FOR COMPLIANCE WITH POST-TERMINATION OBLIGATIONS; CEASE AND DESIST FROM FURTHER USE OF THE KABLOOM MARKS," which demanded that Defendants immediately comply with their post-termination obligations including specifically their obligation to cease any further use of the KaBloom Marks and to deidentify the Store from its former association with the KaBloom Marks and the KaBloom System. *Id.*, Exhibit 4. Nevertheless, despite the clear terms of the Franchise Agreement and KaBloom's repeated demands, Defendants continue to use the KaBloom Marks in violation of the Franchise Agreement and federal and state law, including the following:

First, Defendants have not removed the large sign on the left side interior wall of the Store, which reads "KaBloom The Power of Fresh Flowers." Affidavit of William Dominick, ¶ 5; Exhibit 2.

Second, Defendants have left banners, binders and other materials bearing the KaBloom Marks on the floor of the Store. *Id.*, ¶ 6; Exhibit 3.

Third, Defendants have failed to remove, or to cause to be removed, the KaBloom Marks from the marquee sign for the shopping center where the Store is located. *Id.*, ¶ 3; Exhibit 1.

Fourth, Defendants have only partially removed the primary KaBloom sign over the entrance to the Store. *Id.*, ¶ 7; Exhibit 4.

Fifth, Defendants have only partially scraped a KaBloom sign off the window of the Store. *Id.*, ¶ 8; Exhibit 5.

Sixth, Defendants have not cancelled all online directory listings which associate the Store with the KaBloom Marks. S. McIntosh Affidavit, ¶ 5.

Seventh, Defendants have not returned to KaBloom all manuals, supplements, records, and instructions containing confidential information. S. Siegel Affidavit, ¶ 26.

## II. ARGUMENT

Plaintiffs are entitled to a preliminary injunction enjoining Defendants' continued violations under Fed. R. Civ. P. 65(a) because: (1) Plaintiffs are likely to succeed on the merits of their claims; (2) Plaintiffs will suffer irreparable injury if the injunction is not granted; (3) any such harm outweighs the harms which granting the injunction would cause the Defendants; and (4) the granting of the injunction is in the public's interest. *See, e.g., Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995).

### A.   Plaintiffs Are Likely to Prevail on the Merits of their Breach of Contract, Infringement, and Unfair Competition Claims.

While Plaintiffs have stated five separate claims against Defendants, all such claims relate, in part, to Defendants' continuing unauthorized use of the KaBloom Marks. Therefore, in this case, particularly with respect to Plaintiffs' Lanham Act claims, the key issue in determining whether injunctive relief is appropriate is whether Plaintiffs are likely to prevail on the merits of their claims. *See, e.g., Keds Corp. v. Rene Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989). As this Circuit has recognized, in Lanham Act claims, the other three factors determining whether an injunction should be granted "will flow from" the court's finding on Plaintiffs' likelihood of success.

#### 1.   Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs have a very strong likelihood of success on the merits because Defendants' actions clearly violate the Franchise Agreement and applicable laws as discussed herein:

### a. Breach of the Post-Termination Covenants, Including the Obligation to Cease All Use of the KaBloom Marks.

Defendants have clearly breached the post-termination covenants under the Franchise Agreement and the Guarantee. Section 10.2.1 of the Franchise Agreement expressly provides that "Franchisee shall use only the [KaBloom] Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor." Section 10.2.2 of the Franchise Agreement further provides that "Franchisee's right to use the [KaBloom] Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights." Following termination of the Franchise Agreement, DAA was required to immediately cease all use of the KaBloom Marks, as set out in detail in the Franchise Agreement:

> Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the [KaBloom] System, the [KaBloom] Marks, and all other distinctive forms, slogans, signs, symbols, and devices associated with the [KaBloom] System. In particular, Franchisee shall cease to use, without limitation, all signs, advertising and promotional materials, displays, stationery, forms, and any other articles which display the [KaBloom] Marks . . . [Franchise Agreement, § 18.2.]

According to Section 18.8 of the Franchise Agreement, DAA was required to cancel and remove any listings in local telephone directories or online directories and provide evidence of compliance with this requirement within 15 days of termination of the Franchise Agreement. DAA was also required to immediately deliver to KaBloom any manuals and other confidential materials that it has received from KaBloom. Pursuant to the Guarantee, Armstrong agreed to be individually bound by the post-termination requirements contained in Section 18 of Franchise Agreement "as if [Armstrong] were the 'Franchisee' thereunder." Guarantee, p.1 (Exhibit C to the Franchise Agreement, which is Exhibit 1 to S. Siegel Affidavit).

As set forth more fully in the Statement of Facts, Defendants have not ceased all use of the KaBloom Marks at the Store, have not provided evidence that they have cancelled all telephone or online listings that associate the Store with the KaBloom Marks, and have not returned the manuals and other confidential information loaned to them by Plaintiffs. Therefore, Plaintiffs are highly likely to succeed on their breach of contract claims against Defendants.

### b.  Trademark Infringement.

Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and common law, prohibit Defendants from using KaBloom, Ltd.'s federally registered trademarks in connection with the sale, offering for sale, or distribution of goods and services. Where a terminated franchisee fails to cease use of the franchisor's trademarks, trademark infringement is presumed. "The continued use of a trademark [by the former franchisee] after breach of a franchise agreement is alone dispositive of the infringement issue." *Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 158 (D. Mass. 2001), *citing S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (enjoining franchisee's continued use of franchisor's trademark after franchise agreement was terminated due to franchisee's failure to pay royalties); *accord Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 43 (2d Cir. 1986) ("in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case"); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) ("Once a license has expired, use of the formerly licensed trademark constitutes infringement."); *Two Men and a Truck/Int'l, Inc v. Two Men and a Truck/Kalamazoo, Inc.*, 1995 WL 549278, *5 (W.D. Mich. 1995) ("The law is well settled that continuing to use a franchise mark after the franchise relationship has been terminated is a violation of the Lanham Act."); *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1002 (S.D. Fla. 1992) (noting the "well

9

settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement").

In this case, Defendants have infringed the KaBloom Marks and violated their post-termination covenants as a matter of law by continuing to use the KaBloom Marks on various signs and other materials at the Store, and in online directory listings.

### c. Unfair Competition.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law, prohibit Defendants from falsely designating the origin of goods and services. Section 43(a) is violated where Defendants' use of the KaBloom Marks is likely to cause confusion as to the source or sponsorship of their products or services. *See Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993). Although courts in the First Circuit typically evaluate likelihood of confusion under eight different factors, *see Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 (1st Cir. 1995), cases involving a former franchisee's continuing use of the franchisor's marks present a unique situation. "[A] franchisor seeking injunctive relief against a terminated franchisee has a lesser burden in establishing likelihood of confusion." *Two Men*, 1995 WL 549278 at *6. As one court has stated:

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. . . . Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchisee therefore would be attributed to [the franchisor]. Because of this risk, many courts have held that continued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement.

*Burger King v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983), *cert. denied*, 465 U.S. 1102 (1984) (numerous citations omitted).

In this case, Defendants have not developed a *similar* trademark; they have continued to use the *actual* KaBloom Marks on the Store's exterior signage, on interior signage, on a marquee sign, and in online directory listings. While Defendants have closed the Store, the stigma associated with Defendants' abandoned business continues to be associated with the KaBloom Marks, to the injury of Plaintiffs.

### 2. Plaintiffs Will Suffer Irreparable Harm If the Preliminary Injunction Is Not Granted, and the Granting of the Preliminary Injunction Is In the Public's Interest.

Plaintiffs' showing that they are likely to succeed on the merits is sufficient, in and of itself, to establish both that it will be irreparably harmed if the injunctive relief is not granted and that the granting of such relief is in the public's interest. *See, e.g., Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992); *Alta Vista Corp., Ltd. v. Digital Equipment Corp.*, 44 F. Supp. 2d 72, 75 (D. Mass. 1998). As the First Circuit has recognized, "[b]y its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, good will, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement *as a matter of law*." *Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d at 640 (emphasis added). *See also Hyperterm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) ("Few harms are more corrosive than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it."); *Jiffy Lube*, 968 F.2d at 378 ("trademark infringement amounts to irreparable injury as a matter of law").

In addition, where infringement is shown, the preliminary injunction will be held as a matter of law to be in "the public interest, 'given the societal value of full disclosure and fair

11

competition, together with the policy of the law to provide at least minimal protection to establish trade names. . . .'" *Alta Vista v. Digital*, 44 F. Supp. 2d 72, 75 (quoting *Hypertherm, Inc., v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir. 1987)). *See also Bill Blass, Ltd. v. SZA Corp.*, 751 F.2d 152, 156 (3d Cir. 1984) ("Congress has in the Trademark Act made the policy determination that the public interest is advanced by recognition of property interests in trademarks. Thus the public interest is advanced by preventing the erosion of the value of such interest."); *American Dairy Queen Corp. v. New Line Productions, Inc.*, 35 F. Supp. 2d 727, 733 (D. Minn. 1998) ("Infringement and dilution of trademarks are inherently contrary to the public interest. . . . Accordingly, this factor favors the grant of a preliminary injunction.").

Defendants' misconduct deprives Plaintiffs of the ability to protect and control the goodwill and reputation of the entire KaBloom system, threatens the goodwill associated with the KaBloom Marks, and justifies a preliminary injunction. *See Wesley-Jessen Div. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) (preliminary injunction affirmed since "[c]ourts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods"). The fact that Defendants are no longer operating the Store does not eliminate the threat of irreparable harm. Unless Defendants immediately take down the remaining signs and cease all use of the KaBloom Marks at the Store, there is a substantial risk that another tenant will take over the Store, and Plaintiffs will then be placed in the position of dealing with a third party, with whom they have no agreement, to have the remaining signs removed.

Therefore, because Plaintiffs have shown they will likely succeed on the merits of their infringement and unfair competition claims, it follows that they will suffer irreparable harm if the injunctive relief is not granted and that the granting of such relief will be in the public's

interest. Because Plaintiffs' breach of contract claim is based on Defendants' failure to cease using the KaBloom Marks and their failure to return the manuals and other confidential information, Plaintiffs will suffer irreparable harm if injunctive relief is not granted.

### 3.      The Balance of Harms Favors Plaintiffs.

The balance of hardships tips decidedly in favor of Plaintiffs. Defendants' trademark infringement, unfair competition, and failure to comply with the post-termination obligations contained in the Franchise Agreement have resulted, and will continue to result, in harm to Plaintiffs. As explained in *United States Jaycees*:

> Protection of infringers is not a purpose of the Lanham Act. On the contrary, the Act's objective is the protection of the trademark and the public. Thus, we hold that the avoidance of confusion to the infringer's interests cannot support an order permitting the continued use of the trademark . . .

639 F.2d at 142. In contrast, an injunction against Defendants would only compel them to comply with the terms of the Franchise Agreement and applicable law. Any "harm" Defendants might allege as a result of the injunction is ultimately caused by their own violation of the Franchise Agreement and applicable law by (1) failing to pay for product, royalty fees, advertising fees and other fees; ceasing to operate the store; and anticipatorily repudiating the agreement by refusing to make further payments, which acts each separately resulted in the termination of the Franchise Agreement; and (2) failing to comply with the post-termination provisions of the Franchise Agreement. *See Marker Int'l v. deBruler*, 635 F. Supp. 986, 1003 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988) ("To give undue weight to the economic hardship injunction might create for defendants would be to violate the clear legislative intent behind the statute and undermine the body of decisional law related to trademark infringement and unfair competition.").

In balancing hardships, courts routinely discount for two reasons alleged harm to a defendant where the alleged harm was caused by the defendant's own misconduct. First, defendants with unclean hands have a difficult time arguing the equities. Second, it would simply be unfair to permit Defendants to benefit, or to continue to cause injury to Plaintiffs, based upon their misconduct. *See, e.g., Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829-30 (9th Cir. 1997) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration [when considering a preliminary injunction].'" (citation omitted)); *Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."); *Jiffy Lube*, 968 F.2d at 379 (injunction granted where franchisee brought harm upon himself by failing to make required royalty payments).

Moreover, the balance of harms is presumed to favor the trademark holder in cases of trademark infringement. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). The balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademarks." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecommunications Indus. Assoc.*, 929 F. Supp. 473, 478 (D.D.C. 1996); *Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1333-34 (7th Cir. 1977) (defendant cannot complain of harm where, after being warned, it intentionally engaged in misconduct that gave rise to an injunction).

14

## III. CONCLUSION

There is a substantial likelihood that Plaintiffs will prevail on its claims against Defendants based on Defendants' failure to cease all use of the KaBloom Marks at the Store and elsewhere, failure to remove all online directory information associating the Store with the KaBloom Marks, and failure to return the manuals and other confidential materials—all in clear violation of applicable law and the post-termination covenants in the Franchise Agreement. Plaintiffs will not only suffer the "possibility" of irreparable harm, but harm is both probable and presumed based on Defendants' violations. Accordingly, Plaintiffs are entitled to a preliminary injunction enjoining such violations, including but not limited to:

1. Enjoining Defendants from continuing to display the KaBloom Marks at and around the Store.

2. Enjoining Defendants from using or otherwise infringing upon the KaBloom Marks, including enjoining Defendants from continuing or renewing any telephone directory or online listings that associate the Store with the KaBloom Marks.

3. Requiring Defendants to immediately return to Plaintiffs any of Plaintiffs' confidential information still in their possession.

Respectfully submitted,

PIPER RUDNICK LLP

*/s/ Steven J. Buttacavoli*
Steven J. Buttacavoli (BBO #651440)
One International Place, 21st Floor
Boston, MA  02110-2600
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Counsel for Plaintiffs KaBloom Franchising Corp.
and KaBloom, Ltd.

Dated:  May 12, 2004